U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUN 2 0 2023

TONY R. MOORE, CLERK
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**_____ DIVISION**

| | |
|---|---|
| **LOUIS W. CARBINS, JR.**<br>**And HIEDI P. CARBINS**<br>**PlaintiffS** | **CIVIL ACTION NO.** 23-cv-0830 _____ |
| | **JUDGE** _____ |
| **V.** | **MAGISTRATE JUDGE** _____ |
| **VROOM AUTOMOTIVE LLC,**<br>**and VROOM INC.,**<br>**Defendants** | |

**COMPLAINT**

**TO THE HONORABLE MAGISTRATE JUDGE:**

1.        Plaintiffs, LOUIS W. CARBINS, JR and HIEDI P. CARBINS, who are citizens of Louisiana, and whose mailing address is 2851 Johnston Street No.136, Lafayette, LA, 70503.

2.        Defendant Vroom Automotive LLC, d/b/a Texas Direct Auto and Vroom, is a Texas limited liability company with their principal place of business at 12053 Southwest Freeway, Stafford, Texas, 77477. It is the primary operating entity for Defendant Vroom Inc.'s purchases and sales of used vehicles. It may be served with process by serving their Registered Agent: C T Corporation System, at 1999 Bryan St., Suite 900,  Dallas, Texas 75201-3136. SERVICE OF PROCESS IS HEREBY REQUESTED.

3.        Defendant Vroom Inc. is a Delaware corporation with its principal place of business at 1375 Broadway, 11th Floor, New York, New York, 10018. It may be served with process by serving their Registered Agent: C T Corporation System, at 1999 Bryan St., Suite 900,  Dallas, Texas 75201-3136. SERVICE OF PROCESS IS HEREBY REQUESTED.

## JURISDICTION

4.          This court has jurisdiction over this civil action because the plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $30,000.00. Plaintiffs would respectfully show , VROOM AUTOMOTIVE LLC and VROOM INC., (collectively "Defendants," or "Vroom,")  has engaged in deceptive trade practices, including by failing to satisfy certain terms of sale, by failing to disclose certain vehicle history or qualities/characteristics, and by misrepresenting the work done on sold vehicles, in violation of Texas Deceptive Trade Practices − Consumer Protection Act, Texas Business and Commerce Code § 17.41 et seq. ("DTPA"). Original actions to pursue Vroom were directed to the Louisiana Office of Motor Vehicle in Baton and then forwarded to Texas' Department of Motor vehicle who upon finding several violations by Defendant under the authority granted by section 17.47 of the DTPA upon the grounds that Defendants have engaged in false, deceptive, and misleading acts and practices in the course of trade and commerce as defined in, and declared unlawful by, subsections 17.46(a) and (b) of the DTPA.  Plaintiffs were informed legal actions should be taken and an enforcement suit be filed pursuant to section 17.47 of the DTPA, the plaintiffs are seeking civil penalties, redress for the Plaintiffs, punitive damage and injunctive relief. The plaintiffs are also seeking reasonable attorneys' fees  (if any) and court costs for the prosecution of this action.

## INTRODUCTION

5.          In 2013, Defendants launched a website, vroom.com, through which they buy, sell, and trade used vehicles online nationwide. At their launch, Defendants saw the used automotive market as "ripe for disruption as an industry that is notorious for consumer dissatisfaction," with only 0.9% ecommerce penetration. Defendants see themselves as a "high-volume,

2

low-margin business." In 2019, Defendants began to aggressively scale their business and accelerate their growth. As a result, Defendants nearly doubled their inventory, doubled their reconditioning capacity, and more than doubled their sales. As Defendants continued to aggressively scale in early 2020, COVID-19 took hold across the globe. Rather than suffering a decline, with new car production down due to microchip shortages and supply chain issues caused by the pandemic, the used-car market for ecommerce retailers like Vroom has boomed. In June 2020, Defendants became a public company through an initial public offering and have seen triple-digit year-over-year growth since the start of the pandemic. Over the past three years, Consumers have filed nearly 5,000 complaints with the Better Business Bureau and Office of the Attorney General of Texas. Approximately 4,000 of these complaints have come in the past 12 months. As this petition will show, Defendants have not managed their growth effectively and have allowed inadequate systems and procedures to spiral into violations of the DTPA. These violations include misrepresenting the condition and characteristics of the vehicles they sell, misrepresenting financing approval, *misrepresenting that Defendants have obtained clear title before selling vehicles*, subjecting consumers to spot delivery scams,1 *failing to disclose systemic delays in processing title and registration,* and failing to disclose higher insurance premium requirements for non-Texas consumers. The Plaintiffs seek monetary relief of $30,000 or more, including civil penalties, attorneys' fees (if any), punitive damages, and costs.

## FACTS

6.        PlaintiffS have reason to believe that Defendants are engaging in, have engaged in, or will continue  to engage in, the unlawful acts or practices set forth below. Plaintiffs have further reason to believe Defendants have caused injury, loss, and damage to various consumers including the Plaintiffs, and have caused adverse effects to the lawful conduct of trade and commerce, thereby directly or indirectly affecting the Plaintiffs. Therefore, the Plaintiffs are of the

opinion that these proceedings are not only in their personal interest but also in the public interest.

## TRADE AND COMMERCE

7.          Defendants have, at all times described below, engaged in trade and commerce as defined by subsection 17.45(6) of the DTPA.

## ACTS OF AGENTS

8.          Whenever in this Petition it is alleged that a Defendant did any act, it is meant that Defendant performed or participated in the act or Defendants' officers, agents, or employees performed or participated in the act on behalf of and under the authority of Defendants.

## NOTICE BEFORE SUIT

9.          The Plaintiffs notified the Defendants via phone calls on multiple occasions including upon receipt of cost for registration of vehicle informed Defendants in general of the alleged unlawful conduct described below at least seven days before filing, as may be required by law.

## APPLICABLE LAW

10.         The DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . .." DTPA § 17.46 (a).

## FACTUAL ALLEGATIONS

11.         Defendants own and operate vroom.com, an e-commerce platform for buying and selling used cars, which offers an alternative to a traditional car

4

dealer. Defendants operate primarily online, but also buys and sells used vehicles through a physical storefront in Stafford, Texas. Defendants are licensed independent vehicle dealers in Texas and Florida, and most of their transactions are executed under their Texas dealer license.

12.        Since the pandemic began, more and more consumers have been forced to purchase big ticket items like cars completely online, sight unseen. In addition to a general reluctance to face the crowds of people at a brick-and-mortar auto dealership in a post-pandemic reality, component shortages and sustained demand have led to a spike in used-car prices, of which Defendants have been a beneficiary.

13.        In 2018, Defendants sold approximately 10,000 vehicles online. In 2019, Defendants sold nearly 19,000 vehicles online. In 2020, Defendants sold approximately 34,488 vehicles online, an 82% increase year-over-year. In only the first three quarters of 2021, Defendants sold approximately 53,455 vehicles, a 127% year-to-date increase.

14.        In short, Defendants' growth has been exponential in the last three years of operation.

15.        For consumers considering a vehicle purchase, Defendants offer an online catalog of thousands of previously owned vehicles, promising delivery anywhere in the continental United States. Defendants offer cars from a spectrum of manufacturers, including Tesla, BMW, Honda, Toyota, Ford, and Chevrolet with prices ranging from $11,000.00 to $106,999.00. Approximately 80% of the used vehicles listed for sale on vroom.com were purchased directly from consumers.

16.        Defendants tout a "no haggle, no pressure" experience accessible from any device. Defendants give consumers the ability to filter the selection of vehicles by make, model, mileage, color, and other factors. Once a consumer has

selected a vehicle, they can review the vehicle's profile, which includes approximately 20 photographs of the vehicle, a description of the vehicle and its features, ownership history, and defect disclosures. When a consumer finds the vehicle they want, they can enter their information, select a delivery date, secure financing, add warranty coverage, make a down payment, and upload the necessary identification verifications to finalize the online order. The following shows how Defendants conceptualize the buying process as straightforward and convenient for consumers: After a vehicle is ordered, Defendants' system generates the required supporting documents, populates the documents with the details of the transaction, and delivers the completed documents as electronic files. Many of the documents can be presented to the consumer, signed, stored, and transmitted electronically. Where wet ink signatures are mandated, Defendants mail printed contracts to the consumer via overnight delivery to execute. Defendants aim to convince consumers of how easy it can be to purchase a used vehicle entirely online. Defendants Representations for Buying/Selling Experience

17.         Defendants acknowledge that to earn increased market share in the used car industry they must provide consumers with a trustworthy buying and selling experience: "confidence comes standard with every Vroom vehicle." Trust is even more important in the ecommerce experience because consumers cannot see the car in person prior to purchase. To establish trust before a big purchase, Defendants make representations about the quality, safety, presence of imperfections, and accident history for the used vehicles offered for sale. Defendants also promise to transfer proof of ownership in a timely manner and as required by law. Through these representations and more, Defendants seek to assure consumers that ecommerce is not only a viable car shopping method, but the preferable one.

18.         Whether purchased from a consumer, an auction, or a national rental car company, Defendants transport purchased cars to one of Defendants'

reconditioning facilities. Upon arrival at a reconditioning facility, Defendants claim that their proprietary reconditioning management software platform tracks every cosmetic and mechanical defect, as well as progress towards remediation, and that every vehicle allegedly goes through these rigorous inspections. If they cannot make the vehicle safe and serviceable, Defendants claim that the vehicle is flagged for wholesale auction, even if it cuts into their profits. To that end, Defendants represent that every car listed for sale is a "high-quality Vroom-reconditioned vehicle" that has passed multiple cosmetic, mechanical, and safety inspections, and that vehicles that do not meet their standards will not be listed for sale.

19.        Defendants provide a set of photos taken from multiple angles, both interior and exterior, and list specifications about every vehicle. Defendants promise that if vehicle imperfections are not repaired during the reconditioning process, they will include a disclosure and photographs of the imperfections, so consumers are aware before ordering and paying for non-refundable delivery.

20.        In addition to promises of reconditioning of each vehicle for any cosmetic, mechanical and safety issues, Defendants promote their complimentary 90-day limited warranty with every purchase. This limited warranty is meant to minimize unexpected costs associated with mechanical breakdowns, repairs, parts, and labor. A reasonable consumer would expect such mechanical breakdowns to be a rare and unexpected occurrence after the reconditioning process.

21.        In the past, Defendants advertised that each vehicle has a clean title and has not been in an accident. Defendants have since changed these advertisements: instead of "No Accident Cars Only," or "Shop 1,000s of Accident-Free Cars and Trucks," Defendants now offer a CARFAX auto history report with each vehicle. The distinction is subtle—rather than advertising accident-free vehicles, Defendants now advertise an "accident-free CARFAX

vehicle history report at the time of purchase and sale." Defendants disclaim any responsibility for the accuracy of the information contained in the CARFAX reports and make no representation or warranty on whether the vehicle has been in an accident. As detailed below, some consumers were sold vehicles with apparent damage consistent with a prior accident.

22.        Defendants are not selling a fungible product. It is implied in every transaction that proof of ownership of that vehicle will be provided upon receipt of payment. A title serves as proof of ownership and is essential for selling or registering a vehicle. Registration is necessary to show that a car is legally permitted on public roads. Driving without a current registration is illegal.

23.        As a licensed Texas dealership, Defendants are required by law to process and complete the title and registration process for their Texas customers within 30 days of purchase, or 45 days of purchase if the vehicle is financed. Defendants are required by law to collect the tax, title, and license fees for their Texas customers. Defendants charge consumers a fee for vehicle licensing and registration, which is disclosed as a line item on the final vehicle purchase invoice.

24.        Defendants deliver their vehicles with 60-day temporary tags issued by the DMV. The 60- day temporary tags allow consumers to drive their vehicles immediately while they wait for the Defendants to complete the timely transfer of title and registration. The 60-day window is meant to give a reasonable buffer for an auto dealer to transfer their title to the purchaser and complete registration.

Title and Registration

25.        Nearly 80% of the vehicles Defendants sold in 2021 were customer sourced. Defendants' pandemic-era growth has been rapid, but they are cutting corners to realize those gains. Defendants are turning over their

customer-sourced vehicles so quickly that they are reselling vehicles before they even obtain a clear title. In so doing, Defendants are misrepresenting ownership of the vehicles they are listing for sale on their website. Defendants are not disclosing that the sale is subject to their ability to obtain clear title to the offered vehicle. In some complaints, Defendants have informed purchasers, who had been hopelessly waiting months for title and registration, that they must return the vehicles because Defendants do not have clear title.

26.         The Plaintiffs along with hundreds of consumers have complained that Defendants failed to timely register the change in ownership, leaving consumers with expired temporary tags and with no evidence of ownership.

27.         Defendants designed a system that fails to meet the Texas legal requirements for timely transfer of the title and registration. Other online auto-dealers who comply with Texas's legal requirements for timely transfer of title and registration are at a disadvantage in the marketplace.

28.         To date, the Texas Department of Motor Vehicles has issued five Notices of Department Decision after an investigation which determined that Defendants failed to timely register change in ownership on 168 occasions and offered to sell or sold vehicles without having a certificate of title on at least nine occasions.

29.         Defendants reportedly mislead consumers about their current ability to comply with the State's legal requirements for timely transfer of the title and registration. This all but guarantees that consumers do not understand that they are purchasing a good that they will not be able to prove they own. The complaints evidence consumer shock and frustration—they are not given answers by Defendants when they inquire of the delays in processing their titles and registration. Many consumers have reported waiting as much as a year to receive the title to their purchased vehicle, and sometimes even longer.

Consumers have compared their purchases from Defendants to "bricks," or "driveway ornaments" when it became unlawful for them to operate their vehicles.

30.      The Plaintiffs' vehicle was purchased on September 13 ,2021 and temporary tags were provided on three separate occasions ending with the last one expiring on February 22, 2022.

31.      The Plaintiffs were informed by Vroom that no additional tags could be provided as the max is three according to Texas state law.

32.      The Plaintiffs informed the Defendants that due to physical limitations, being disabled, having no other mode of personal transportation, and numerous doctors appointments each month a rental car should be provided by the defendants until the title was sent to the Plaintiffs or the lien-holders, Navy Federal Credit Union.

33.      The Defendants were also informed through emails and via telephone conversations that the lien-holders were requesting the title promptly. Navy Federal Credit Union also reached out to Vroom and received the same response as the Plaintiffs.

34.      On September 26, 2022 the lien-holders began charging additional interest on the loan and changed the type of loan provided due to waiting almost a year for the title. Vroom was emailed a copy of the letter and further inquiry was made on the status of the title. No response received from the Defendants on this matter.

35.      Warren Kirkland, Enforcement Division-Motor Vehicle Texas Department of Motor Vehicle, was emailed by the Plaintiffs' requesting an update on the status of the case filed against the Defendants on behalf of the Plaintiffs as

well as informing Mr. Kirkland of the Plaintiffs intent to pursue legal actions against the Defendants. It should be noted  a week after this email to Mr. Kirkland Vroom emailed the Plaintiffs regarding the title.

36.         Upon the suggestion of Warren Kirkland, the Plaintiffs begin to seek legal actions against the Defendants after waiting an entire year for this matter to be resolved and having no response to any attempts to reach the Defendants over a period of several months.

37.         Texas DMV informed the Plaintiffs through email on May 27,2022 the Defendants were in violation of several laws. Warren Kirkland emailed Plaintiffs on June 29, 2022 about the violations and that the complaint and his recommendations were forwarded to the attorney that would be taking over the case going forward. It was at this time Mr. Kirkland suggested the Plaintiffs should seek legal recourse against the Defendants.

38.         The Defendants attempted to buy back the vehicle from the Plaintiffs without returning the entire cost of the vehicle and the cost for the paperwork and other miscellaneous expenses the Plaintiffs paid out of pocket on the vehicle that should have been provided through Vroom before delivery of the vehicle to the Plaintiffs. It was later discovered this is a common practice of the Defendants regardless of the problems with the vehicle being entirely due to the Defendants misleading and deceptive practices.

39.         Several attempts to reach an amicable agreement were made by the Plaintiffs. However, the Defendants were not willing to put in writing any fair resolution to the matter which left the Plaintiffs with the only one available being to keep the vehicle and continue to wait on the title to be delivered per the original agreement through the contract.

40.          Plaintiffs made two separate visits to Vroom's dealership located at 12053 Southwest Freeway, Stafford, Texas, 77477. Each visit was met with prolonged waiting to speak with someone who might be able to help resolve the matter. During both visits Plaintiffs were informed that the title and registration department was not in the main building and that it is always the same concern every time a consumer comes into the building. Upon reaching an actual person through the phone line the agent Stephanie Leonhardt, Customer Support Manager was informed that the person who would know about  the whereabouts of the Plaintiffs title was out of the office for the day. The Plaintiffs arrived at eight in the morning during the first trip and were asked to go to lunch on Vroom while they continued to seek information on the title. No success to get an accurate update on the title was reached after lunch at which time the Plaintiffs agreed to go home and await any information the Defendants could get when the person who handles titles and registration returned to work. No call or email was ever received from the Defendants.

41.          The Plaintiffs were switched from one person and department to another person and department throughout months of seeking some resolution to the matter. The Plaintiffs finally received the title on October 6,2022 only after involving the DMV of Louisiana and Texas.

42.          The duplicate title was issued on June 22, 2022 but not sent to the Plaintiffs unil after an email was sent to Warren Kirkland on September 26 ,2022 informing him that it was over a year and still no title and therefore, the Plaintiff were starting legal procedures against Vroom. Mr. Kirkland was also informed that any attempts to get a response or undated from the Defendants was ignored and never answered. The Plaintiffs finally received an email once again requesting an address to overnight the paperwork and title  to even though the address had been provided in emails and calls several times previously. The title arrived on October 6, 2022.

43.	The duplicate title was issued on June 22, 2022 but not mailed out until October 5,2022 after Vroom emailed and offered again to buy back the vehicle before sending the title. The Defendants were supposed to deal with registration initially but decided it was the Plaintiffs job due to the Plaintiffs getting finance through a third party leader of their own. The penalty for not filing in the 30 days required by Louisiana law was steep.


## ADDITIONAL FACTS

44.	One Texas consumer stated that she purchased her vehicle in February 2021 and had been unable to obtain the title and registration from Defendants as of the date of her complaint to the Office of the Attorney General—nearly a year later—on January 15, 2022. She received numerous temporary tags and excuses ranging from DMV delays caused by the pandemic to title errors.

45.	Another Texas consumer also complained that he purchased a vehicle in February 2021 and has yet to receive the title as of March 2022. The consumer was contacted in September 2021 by the Fort Bend County Tax Assessor's office to inform him that they could not transfer title because of a discrepancy in the chain of title of the vehicle. The consumer opened a case with Defendants' customer support service and has yet to reach a resolution through them.

46.	Yet another Texas consumer reportedly received a letter from the tax accessor's office over three months after she purchased her vehicle from Defendants claiming there was an odometer discrepancy on the title application. The consumer claimed that Defendants assured her they would correct the problem and get her the title and registration. Three months later she received the same letter. When she filed her complaint to the Office of the Attorney General it

had been over a year since she had her vehicle delivered and still did not have title and registration. The consumer finally received her title from Defendants on March 10, 2022, over a year and three weeks after she purchased the car in full.

## INSURANCE COVERAGE FOR TEMPORARY TAGS

47.        The failure to secure title and registration is also evident with, and the source of, additional deceptive acts for out-of-state consumers. After the expiration of the initial 60-day temporary tags, Defendants offer to provide the Plaintiffs and other consumers, both in Texas and out-of-state, with a 30-day special temporary tag from the DMV. Defendants are limited to purchasing four 30-day temporary tags per customer.

48.        Defendants cannot assure their out-of-state consumers or the Plaintiffs that the 30-day temporary tags are even valid in the consumer's home state. To the contrary, many out-of-state consumers have complained of multiple citations or impounded vehicles while displaying Texas temporary tags. One consumer's temporary tag had expired and her pleas for help were ignored by Defendants. She wrote: "they act like I'm asking for something I don't justly deserve," and "I have two children that I can't pick up from school if they are sick—I have doctors' appointments I can't drive myself to."

49.        Worse, Defendants are only allowed to issue a 30-day temporary tag if the vehicle owner has insurance coverage consistent with minimum coverages required by Texas statute. Many states have lesser automobile insurance policy minimums. Defendants have forced out-of-state consumers including Plaintiffs to seek new insurance policies or change their insurance coverage, often with increased premiums, so Defendants can provide temporary tags to the out-of-state consumer while they try to sort out their own delay issues.

50.         The Plaintiffs did not bargain for this undesirable position. The Plaintiffs who live outside of Texas would not have purchased a vehicle from Defendants if it meant Plaintiffs had to increase their insurance policy's minimum coverage simply to match Texas requirements and receive multiple 30-day temporary tags or risk driving their recently purchased vehicles illegally in their home states. This issue is not disclaimed by Defendants at the front end of the sales transaction.

## VIOLATIONS

51.         Defendants have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA § 17.46(a).

52.         Defendants represented that the agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of DTPA § 17.46(b)(12).

53.         Defendants represented that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced, in violation of DTPA § 17.46(b)(22).

54.         Defendants failed to disclose information concerning goods or services which was known at the time of the transaction, and such failure to disclose this information was intended to induce the Plaintiffs into a transaction into which the Plaintiffs would not have entered had the information been disclosed, in violation of DTPA § 17.46(b)(24).

## INJURY TO PLAINTIFFS

55.         Defendants have, by means of these unlawful acts and practices, obtained money from Plaintiffs who are entitled to restitution or punitive

damages, or in the alternative, have caused actual damages to the Plaintiffs who are entitled to compensation.

### PRAYER

56.          WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited according to the law to appear and answer herein. Plaintiff prays that the Court will issue an ORDER enjoining Defendants, their officers, agents, servants, employees, and any other persons in active concert or participation with Defendants from the following:

A. Posting pictures and specifications of vehicles on their website that do not represent the vehicle being offered for sale;

B. Failing to identify imperfections, including what would be deemed minor cosmetic imperfections or normal wear and tear, in a clear and conspicuous written disclosure before a consumer purchases the vehicle;

C. Representing that a vehicle previously possessed features, characteristics, or benefits that it does not;

D. Representing that they conduct a safety, mechanical, and cosmetic inspection to ensure that the vehicle meets all safety requirements when they have not;

E. Failing to clearly and conspicuously state that an accident-free CARFAX report is not a guarantee that the vehicle is indeed accident-free;

F. Misrepresenting or failing to disclose financing terms and approval status;

G. Failing to complete the vehicle registration process as required by law;

H. Failing to disclose or misrepresenting issues that will result in title transfer or registration delays as they become apparent;

I. Advertising or selling vehicles without having clear title in Defendants' possession;

J. Failing to disclose or misrepresenting that obtaining temporary tags may result in higher insurance premiums.

57.        Plaintiff further requests that this Court award money for punitive damages and restitution of monies paid by Plaintiffs.

58.        Plaintiff further requests that Defendants be ordered to pay to the Plaintiffs all costs of Court, and reasonable attorney's fees (if any) decree that all of Defendants' fines, penalties or forfeitures are not dischargeable in bankruptcy. See 11 U.S.C. Section 523(a)(7).

59.        Plaintiff prays for all further relief, at law or inequity, to which it is justly entitled.

Respectfully submitted,

Louis W. Carbins, Jr.
2851 Johnston St. No. 136
Lafayette, LA 70503
(504) 858-5016
                    and

Hledi P. Carbins
2851 Johnston St. No. 136
Lafayette, LA 70503
(860) 205-0908